## Systems

### INDEPENDENT REPRESENTATIVE AGREEMENT

This Agreement is made by and between the COMPANY, as hereinafter defined, and Selectron Korea Inc., a corporation organized under the laws of the Republic of Korea ("REPRESENTATIVE"), effective as of 1 March 2012 (the "Effective Date"). As used in this Agreement, the term, "COMPANY" refers, individually, to each of the following companies that has executed a Listed Product and Commission Schedule attached to this Agreement: Textron Systems Corporation ("TSC"), a Delaware Corporation; AAI Corporation, a Maryland corporation; ESL Defence Limited, a United Kingdom corporation; and Overwatch Systems Limited, a Delaware corporation.

### 1.   APPOINTMENT AND TERRITORY

(a)  The COMPANY hereby appoints REPRESENTATIVE to act as its non-exclusive independent representative for the sale of only the COMPANY'S products, spare parts and accessories set forth in its respective Listed Product and Commission Schedule to this Agreement (collectively the "Listed Products") in the Republic of Korea (the "Territory") under the terms and conditions set forth hereinafter, and REPRESENTATIVE hereby accepts such appointment.

(b)  The COMPANY reserves the right at any time, or from time to time, without prior notice to REPRESENTATIVE, to discontinue, add, adopt or change any Listed Product, trademark, trade name or the design or specifications of any Listed Product; provided, however, that the COMPANY shall promptly notify REPRESENTATIVE of the COMPANY's discontinuance of any Listed Product which the COMPANY knows is being actively promoted by REPRESENTATIVE, and provided, further, however, that the discontinuation, addition, adoption or change of any Listed Product, trademark, trade name or the design or specification of any Listed Product shall not modify the obligations of the COMPANY or the rights of the REPRESENTATIVE under any contract for the purchase of Listed Products by REPRESENTATIVE that is in effect at the time of any such change.

### 2.   DUTIES OF REPRESENTATIVE

REPRESENTATIVE agrees to:

(a)  Establish and maintain an official place of business in the Territory and to permit the COMPANY to inspect such facilities during normal business hours;

(b)  Conduct business with the highest degree of honesty and integrity and to comply strictly with all terms and conditions of this Agreement;

(c)  Keep the COMPANY informed of the actual and potential requirements of the COMPANY's customers and potential customers and provide the COMPANY with current information and data relating to the general economic and political situation in the Territory and the potential market for the Listed Products. REPRESENTATIVE shall also provide the COMPANY with current, generally available business information, including information concerning competitive products, information concerning relevant actual or proposed governmental decrees, regulations or legislation, and any other information that may affect sales of the Listed Products. All such information shall be either in the public domain or specifically authorized by the applicable customer or procurement authority for release to the COMPANY. The REPRESENTATIVE shall, at the COMPANY's request from time to time, provide the COMPANY with a list of prospective customers for the Listed Products and the anticipated sales in the Territory.

Rev 10/18/11

(d)   Promote the reputation and sale of the Listed Products in the Territory by:

(1)   Providing translation services for meetings attended by COMPANY personnel;
(2)   Providing reasonable transportation assistance as appropriate and standard in the Territory;
(3)   Making available COMPANY brochures and other materials to potential customers;
(4)   Arranging meetings with potential customers and other potential partners in the Territory; and
(5)   Performing such other services as the COMPANY may request that are reasonably necessary to promote the Listed Products.

(e)   Obtain offers from responsible customers to purchase the Listed Products for delivery in the Territory; and to submit such offers to the COMPANY, acceptance or rejection of which for any reason whatsoever shall be within the sole discretion of the COMPANY;

(f)   Subject to compliance with U.S. export control laws, furnish necessary technical advice and product support to customers including:

(1)   Advising customers relative to technical specifications and available configuration of Listed Products;
(2)   Assisting in and/or conduct demonstrations of Listed Products;
(3)   Assisting and advising customers in the proper operation and maintenance of Listed Products;
(4)   Serving as liaison between customers and the COMPANY;
(5)   Assisting customers in spare parts support for the Listed Products; and
(6)   Providing technical advice and product support during the immediate post-delivery period;

(g)   Display, advertise and offer for sale the Listed Products at the prices and under the terms and conditions as may be established by the COMPANY;

(h)   Pay all costs and expenses incurred in the promotion and sale by REPRESENTATIVE of the Listed Products;

(i)   Provide monthly written reports to the COMPANY setting forth the customers and sales programs with which REPRESENTATIVE has been engaged during the previous month, including the status of all marketing and sales programs with which REPRESENTATIVE is involved, and furnish such other reports as the COMPANY may reasonably request; and

(j)   Furnish the COMPANY, upon request, complete and accurate financial statements of REPRESENTATIVE, which the COMPANY agrees to hold in confidence; and

(k)   If requested by the COMPANY, provide assistance to the COMPANY in connection with the COMPANY's offset obligations in the Territory (which may be variously described as industrial cooperation, industrial participation, countertrade, and the like).  Such assistance may include (1) assistance in drafting and presenting offset proposals, and preparing programs and projects; (2) providing liaison with applicable government agencies and local businesses in connection with such offset proposals, programs and projects; and (3) assistance in presenting claims for crediting of offset projects after a sales contract has been entered into.

## 3.   <u>DUTIES OF THE COMPANY</u>

The COMPANY agrees to:

(a)  Support REPRESENTATIVE in its efforts to promote the sale of the Listed Products, to furnish appropriate sales literature and descriptions of such products, and generally to render such sales assistance as may be, in the COMPANY's sole judgment, reasonable and appropriate, without assuming any responsibility for REPRESENTATIVE's sales efforts or any obligation to render assistance beyond when in the COMPANY's sole discretion is deemed adequate;

(b)  Endeavor to obtain all U.S. export approvals necessary for REPRESENTATIVE to perform its duties hereunder, provided that Company shall have no liability to REPRESENTATIVE for payment of commissions or other compensation related to any transaction for which REPRESENTATIVE has assisted the Company but for which the Company is unable to obtain any necessary U.S. export approval;

(c)  Permit REPRESENTATIVE to use the COMPANY name and trademark in connection with sales of the Listed Products, but only to the extent and under the conditions which the COMPANY may approve in writing;

(d)  Timely accept or reject offers to purchase Listed Products by or obtained by REPRESENTATIVE; and

(e)  Pay REPRESENTATIVE compensation as provided in Sections 4 and 5 of this Agreement.

4.     **REPRESENTATIVE'S COMPENSATION**

(a)  The COMPANY will pay commissions to REPRESENTATIVE at the rates provided in its respective Schedule A, B, C or D of this Agreement on all purchases of Listed Products by third parties who purchase directly from the COMPANY, subject to the further provisions of this Agreement. Such commissions are payable only if REPRESENTATIVE has actively participated in obtaining such offer and/or contract to purchase from the third party as determined in the reasonable discretion of the COMPANY, and the transaction is completed by delivery within the Territory.

(b)  Except as noted in (c) below, the COMPANY shall not be obligated to pay, and REPRESENTATIVE specifically acknowledges that it shall not have the right to receive, commissions or other compensation on the following transactions:

(1)     Sale by the COMPANY under a program where, for any reason whatsoever, commissions or other compensations to REPRESENTATIVE are disallowed or limited by (i) the United States Government, (ii) the government of any country to which Listed Products may be sold or (iii) by the terms of any contract for the sale of the Listed Products or procurement regulation or policy applicable to any such sale; or

(2)     Transfer, gift, or sale of Listed Products by the United States Government when the intention of the United States Government to make such transfer, gift or sale was not disclosed to the COMPANY prior to the relevant contract being entered into by the United States Government.

(3)     Sales to REPRESENTATIVE or an Affiliate (as hereinafter defined) for resale to qualified third parties in the Territory.  For purposes hereof, Affiliate means any business concern which is under (direct or indirect) common ownership or control as the REPRESENTATIVE, at any level and by any individual, concern or entity.

(c)  Commissions shall be payable to REPRESENTATIVE at the rates provided in the applicable Schedules to this Agreement for all other sales or purchases of Listed Products made by the

United States Government, or by direction of the United States Government or any agency or instrumentality thereof, to a national or local government within the Territory, or to any agency or instrumentality thereof, PROVIDED THAT

      (1)    REPRESENTATIVE has actively participated in developing the requirements for the Listed Products, and

      (2)    Prior to the initial contract between the COMPANY and the United States Government with respect to the sale of Listed Products, REPRESENTATIVE has advised the COMPANY in writing of the specific requirement for and potential sale of the Listed Products.

    (d)    REPRESENTATIVE shall be entitled to compensation only with respect to offers of purchase of Listed Products accepted by the COMPANY prior to the expiration or termination of this Agreement and that result in a sale of the Listed Products during the term of this Agreement or within six (6) months of expiration or termination of this Agreement and only if the additional conditions set forth below in subparagraphs (1), (2), (3), and (4) of this paragraph (d) have been met. The COMPANY reserves the right to appoint other non-exclusive representatives in the Territory and the right to sell, directly or indirectly, the Listed Products by any means other than through the REPRESENTATIVE, and no commission or other revenue shall be owed by the COMPANY to the REPRESENTATIVE with respect to such sales of such Listed Products other than through the REPRESENTATIVE. Compensation shall be payable to REPRESENTATIVE in accordance with the applicable Schedule of this Agreement only if all of the following conditions are met:

      (1) Prior to the initial contract between the COMPANY and the Customer with respect to a particular sale of Listed Products (the "Sales Opportunity"), REPRESENTATIVE shall have advised the COMPANY in writing of that Sales Opportunity;

      (2) REPRESENTATIVE is the first to bring that Sales Opportunity to attention of the COMPANY;

      (3) The COMPANY shall have notified REPRESENTATIVE in writing that COMPANY has accepted that Sales Opportunity; and

      (4) The REPRESENTATIVE shall have assisted the COMPANY in pursuing that Sales Opportunity.

The COMPANY undertakes to notify the REPRESENTATIVE promptly whether a Sales Opportunity has been accepted. REPRESENTATIVE acknowledges that the COMPANY shall not be liable for more than one payment of compensation, at the rate provided in this Agreement, with respect to any sale of Listed Products, whether the Sales Opportunity has been first brought to the attention of the COMPANY in accordance with the requirements of this paragraph by REPRESENTATIVE or by any other representative in the Territory. REPRESENTATIVE shall not undertake any marketing activities in connection with products developed, manufactured and sold by COMPANY other than the Listed Products (unless additional products are added to the Listed Products by an amendment to the applicable Schedule to this Agreement signed by both the COMPANY and REPRESENTATIVE), and in no event shall REPRESENTATIVE be entitled to receive compensation with respect to the sale of products other than the Listed Products.

    (e)    Commissions that are based on a percentage of the sales price will be calculated on the basis of the Net Sales Price, as hereinafter defined, of Listed Products sold. "Net Sales Price" as used herein shall mean only the price that is actually paid to the COMPANY for Products and shall not include (i) taxes, customs duties, crating, transportation and insurance charges, (ii) any amount that may have been included in the contract to cover the REPRESENTATIVE's commissions hereunder, (iii) the value of the

Rev 10/18/11

(U.S. Government's administrative charges assessed in connection with a Foreign Military Sale (FMS) arrangement, or (iv) any amount with respect to Listed Products provided to any customer without charge.

(f)   Provided that the COMPANY has given prior written approval, the REPRESENTATIVE will be reimbursed for actual and reasonable out-of-pocket expenses incurred by the REPRESENTATIVE for incidental services, such as printing and production of presentation, proposal and advertising materials, translation services, transportation, etc., beyond those activities contemplated in Section 2, provided that no individual expense is over $2,000. The RESPRESENTATIVE shall provide documentation of such expenses satisfactory to the COMPANY, including applicable invoices and receipts, before reimbursement will be made. Notwithstanding the foregoing, unless REPRESENTATIVE shall have obtained the COMPANY's prior written consent, REPRESENTATIVE is not authorized, nor shall it offer any gifts, meals, hospitality, entertainment or travel to any current or potential customer of the COMPANY.

(g)   REPRESENTATIVE shall be responsible for all applicable national, state, provincial and local taxes, value added or sales taxes, exchange, interest, banking, collection and other charges and levies and assessments pertaining to REPRESENTATIVE'S compensation and its activities under this Agreement and shall indemnify COMPANY against all such taxes and other charges, expenses, levies and assessments and any other liabilities arising in connection with such taxes, charges, levies and assessments.

(h)   Notwithstanding the foregoing, REPRESENTATIVE acknowledges and agrees that it will not be entitled to, and hereby waives any right to, any amounts that may otherwise be owed to it under this Agreement if the Agreement is terminated pursuant to Section 9(c) below.

(i)   The COMPANY shall have the right, in its sole discretion and without obligation to REPRESENTATIVE, to decline or reject any sales contract or purchase order if it determines, in its sole discretion, that it is unable to profitably or properly perform such order, or that its best interests are otherwise served by rejection of such order, or for any other reason. In addition, the COMPANY, may from time to time, without prior notice to REPRESENTATIVE, make changes in the prices, terms and conditions of sale of the Listed Products as the COMPANY shall determine in its sole discretion.

5.   PAYMENT OF COMPENSATION TO REPRESENTATIVE

(a)   Compensation shall be due and payable within sixty (60) days after all of the following conditions have been satisfied:  (i) receipt by the COMPANY of full payment from the customer; provided, however, that if payment from the customer is made in installments, the commissions payable to REPRESENTATIVE shall be paid in commensurate pro rata installments, (ii) receipt of an invoice from REPRESENTATIVE in the form attached hereto as Exhibit 1, (iii) receipt from REPRESENTATIVE of an updated Certificate in the form attached hereto as Exhibit 2, and (iv) receipt from REPRESENTATIVE of its latest activity report. The COMPANY will pay commissions to REPRESENTATIVE monthly or quarterly, at REPRESENTATIVE's option, covering the commissions earned and due at the end of the preceding month or calendar quarter. If the amount of payment that the COMPANY actually receives under a contract for the sale of Listed Products is increased or decreased for any reason, including but not limited to full or partial termination of the contract by the COMPANY's customer, there shall be a corresponding adjustment in the amount of REPRESENTATIVE's compensation; and REPRESENTATIVE shall repay COMPANY any excess compensation already paid to it within thirty (30) days of COMPANY's request for repayment.

(b)   Commission payments will be made only by check mailed to REPRESENTATIVE's address as noted in this Agreement and/or by bank transfer to REPRESENTATIVE's bank account in the country of that address as set forth in Exhibit 1. Checks and wire transfers will be made only in the name of

REPRESENTATIVE. Payments to REPRESENTATIVE are subject to all applicable laws and regulations.

## 6.    COMPLIANCE WITH LAWS AND REGULATIONS

(a)   REPRESENTATIVE acknowledges receipt of a copy of Textron's *Business Conduct Guidelines* ("BCGs") (see http://www.textron.com/resources/textron_business_conduct_04.pdf - note also that a printed version is available upon request), confirms its understanding of the provisions of the BCGs that apply to contracting parties working with Textron, and agrees to comply with those provisions in connection with its work for the COMPANY. REPRESENTATIVE specifically affirms that no competitive information shall be solicited, accepted, used or possessed by REPRESENTATIVE or by any subagent, sub-representative, consultant or other party retained by or paid by REPRESENTATIVE in connection with the sale or distribution of the Listed Products, unless such solicitation, acceptance, use or possession is consistent with applicable laws and business ethics. REPRESENTATIVE shall not solicit, use, accept, or possess information from any person who is under an obligation of confidentiality to his or her employer or to any other person or entity not to disclose such information, and REPRESENTATIVE shall not disclose any such information to the COMPANY. Further, REPRESENTATIVE warrants that it has the right to disclose all information transmitted to the COMPANY under this Agreement. REPRESENTATIVE agrees to hold the COMPANY harmless from any and all injury, loss, or damage which may occur due to REPRESENTATIVE's breach of this warranty.

(b)   REPRESENTATIVE affirms that it has not and agrees that it will not, in connection with the transactions contemplated by this Agreement or in connection with any other business transactions involving the COMPANY, make, offer, or promise to make any payment or transfer anything of value, directly or indirectly, (i) to anyone working in an official capacity for a government, government entity (including employees of government corporations) or public international organization; (ii) to any political party, official of a political party or candidate; (iii) to an intermediary for payment to any of the foregoing; (iv) to any officer, director, employee or representative of any actual or potential customer of the COMPANY; (v) to any officer, director or employee of Textron Inc. or any of its affiliates; or (vi) to any other person or entity if such payment or transfer would violate the laws of the country in which made or the laws of the United States. It is the intent of the parties that no payments or transfers of value shall be made, offered, or promised which have the purpose or effect of public or commercial bribery, acceptance of or acquiescence in extortion, kickbacks or other unlawful or improper means of obtaining business for any person or securing any improper advantage. Unless REPRESENTATIVE shall have obtained the COMPANY's prior written consent, REPRESENTATIVE shall not offer any gifts, meals, hospitality, entertainment or travel to any current or potential customer of the COMPANY.

(c)   The U.S. Foreign Corrupt Practices Act, similar laws of other countries where applicable (together, the "Global Anti-Corruption Laws"), and related Textron policy prohibit, among other things, Textron (including its subsidiaries) and anyone acting on its behalf to make or offer payment, promise to pay, or authorize the giving of anything of value to: (i) any officer or employee of, or any person acting in an official capacity for, a government or any department, agency or corporation thereof, or any political party, party official or candidate; or (ii) any person, while knowing or having reason to know that all or a portion thereof will be offered, given or promised, directly or indirectly, to anyone described in (i) above, for the purpose of:  [a] influencing any act or decision by such person in his official capacity, or [b] inducing him to use his influence with a government to affect, either by action or inaction, any act or decision of such government to obtain or retain business for any person or secure an improper advantage. REPRESENTATIVE acknowledges receipt of a summary of the Global Anti-Corruption Laws (for the full      text      of      the      U.S.      Foreign      Corrupt      Practices      Act,      *see* http://www.usdoj.gov/criminal/fraud/docs/statue.html), confirms its understanding of the provisions of the Global Anti-Corruption Laws, and agrees to comply with those provisions and to take no action that might cause the COMPANY to be in violation of such laws.

(d)   REPRESENTATIVE affirms that it has disclosed to the COMPANY that no director or direct or indirect owner of REPRESENTATIVE; and to the best of REPRESENTATIVE's knowledge, no employee or other person who will be involved in REPRESENTATIVE's work for the COMPANY, is a Government Official, political party official or candidate, or a Close Family Member of such an official or candidate.  In the event that during the term of this Agreement there is a change in the information required to be disclosed in this paragraph, REPRESENTATIVE agrees to make immediate disclosure to the COMPANY.  If, in the opinion of the COMPANY, such change substantially detracts from or increases the risks related to its relationship with REPRESENTATIVE, the COMPANY will have the right to require that the individual(s) who have the relevant relationships refuse themselves from any potential conflict of interest. If an owner of REPRESENTATIVE or a Close Family Member of an owner becomes a Government Official, political party official or candidate who the COMPANY, in its discretion, determines may have influence over any aspect of the COMPANY's business; or if such an official or candidate becomes an owner of REPRESENTATIVE or Close Family Member of an owner, such changes will constitute grounds for termination of this Agreement pursuant to Section 9(e) of this Agreement. For the purposes of this agreement, "Government Official" means any officer or employee of any government or any department, agency or instrumentality thereof, or of any government-owned or government-controlled corporation or any public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, instrumentality, corporation or public international organization.  For the purposes of this agreement, "Close Family Member" means the individual's spouse; the individual's and the spouse's parents, grandparents, siblings, children, nieces, nephews, aunts, uncles and first cousins; the spouse of any of these people; and any other individuals who share the same household with the Government Official.  For any publicly-traded companies in REPRESENTATIVE's chain of ownership, the requirements of this Section 6(d) apply to only owners of five percent (5%) or more of the equity in the relevant company or who are otherwise known to REPRESENTATIVE as owners of the relevant company.

(e)   REPRESENTATIVE hereby affirms that it will obtain the written approval of the COMPANY prior to the use, retention or appointment of any subagent, sub-representative, sub-consultant or other third party sub-intermediary in connection with the services to be provided under this Agreement, and that any such sub-intermediary will be required to comply with all applicable procedures to be appointed as an authorized intermediary of the COMPANY.  Any approval of such a sub-intermediary will be conditioned on, among other things, REPRESENTATIVE confirming in a signed writing to be incorporated into this Agreement that the sub-intermediary satisfies and will continue to satisfy the requirements of Section 6(d) above, and the COMPANY confirming to its own satisfaction that the information provided by REPRESENTATIVE and the sub-intermediary in this regard is accurate.

(f)   In the event the COMPANY notifies REPRESENTATIVE that the COMPANY has information or belief that there may be a violation of the Global Anti-Corruption Laws by REPRESENTATIVE or by any subagent, sub-representative, sub-consultant or other third party sub-intermediary retained by or paid by REPRESENTATIVE in connection with this Agreement, REPRESENTATIVE agrees to respond to the COMPANY's inquiries as to the possible violation and to grant the COMPANY the right to audit REPRESENTATIVE's books, records and other relevant documentation. This obligation shall continue after the expiration or termination of this Agreement.

(g)   REPRESENTATIVE agrees that it will, at the request of the COMPANY certify that it has not, and to its knowledge no other person, including but not limited to every owner, director, employee, subagent, sub-representative, sub-consultant or other third party sub-intermediary of REPRESENTATIVE has made, offered to make, agreed to make, or authorized any payment, loan, donation or gift of money or anything else of value, directly or indirectly, to or for the benefit of any Government Official, political party, party official or candidate, or to a Close Family Member or nominee of such an official or candidate, in order to obtain or retain business, or secure any improper advantage.

REPRESENTATIVE further agrees that should it learn of information regarding any such payment or offer, or any violation of the Global Anti-Corruption Laws or Textron's Business Conduct Guidelines in connection with the COMPANY's business, REPRESENTATIVE will immediately advise the COMPANY of such knowledge or suspicion.

(h)     REPRESENTATIVE acknowledges that Part 129 of the U.S. International Traffic in Arms Regulations (www.pmddtc.state.gov/reference as has been on our official font LAS Part 129.pdf) requires brokers of defense articles and defense services to register with the U.S. Department of State's Directorate of Defense Trade Controls (DDTC). REPRESENTATIVE agrees to comply during the term of this Agreement, at REPRESENTATIVE's own expense, with all of the requirements of Part 129 applicable to REPRESENTATIVE and agrees, if required, to register as a broker and that it will not conduct brokering activities on behalf of the COMPANY prior to approval of such registration.    Upon approval, REPRESENTATIVE shall provide the COMPANY with a copy of such registration.

(i)     REPRESENTATIVE agrees that full disclosure of this Agreement, including compensation payable hereunder, may be made at any time and for any reason to whomever the COMPANY has a legitimate need to know such terms, including without limitation, governmental bodies in the United States and the Territory.

(j)     In connection with its duties under this Agreement, REPRESENTATIVE shall comply with all applicable laws of the United States and the countries comprising the Territory, if any, and shall do nothing to cause the COMPANY to be in violation of such laws, including, without limitation, the U.S. Export Administration Act (50 USC 2401, et seq.), and the U.S. Arms Export Control Act of 1976 (22 USC 2751-2779), which control the export and re-export of commercial and military goods, and the regulations thereunder. REPRESENTATIVE shall supply the COMPANY with all information or certificates reasonably requested by the COMPANY in connection with compliance with any such laws or regulations.    It is the responsibility of the REPRESENTATIVE to obtain all necessary licenses and approvals in order to provide the services contemplated in this Agreement. During the term of this Agreement, REPRESENTATIVE shall maintain its registration with the Defense Acquisition Program Administration.  REPRESENTATIVE shall hold COMPANY harmless from all actions, proceedings, claims, rulings, damages, penalties, fines, costs, expenses, and fees, including court costs and reasonable attorneys' fees and expenses, arising from the failure of REPRESENTATIVE to comply with REPRESENTATIVE's covenants in this Section 6(j).

(k)     REPRESENTATIVE agrees that each of its personnel providing services under this Agreement shall timely complete such compliance training as the COMPANY shall designate and provide to the REPRESENTATIVE.

7.     **CONFIDENTIALITY.**

In the course of providing services under this Agreement, it may be necessary for each party to access another party's competitive sensitive, proprietary or trade secret information, which includes but is not limited to: financial, business, marketing, scientific, technical, economic or engineering information, including software, interfaces, components, patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs or codes, whether tangible or intangible, and whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing (collectively "Proprietary Information"). Proprietary Information may relate to any party or any affiliate of that party. The parties agree that the following provisions shall govern the disclosure of Proprietary Information under this Agreement:

Rev 10/18/11

(a)   Except as required in the performance of this Agreement and with the express written consent of the disclosing party, the receiving party will not use, publish, disseminate or disclose Proprietary Information to any third party.  The receiving party shall hold each item of Proprietary Information received under this Agreement in confidence and not use or disclose it other than for the purpose of such disclosure, or as otherwise permitted in this Agreement.  Each party agrees that it will protect Proprietary Information using the same degree of care it uses to protect its own Proprietary Information, but in no event less than a reasonable degree of care.  The receiving party shall not be liable for use or disclosure of any such Proprietary Information if the same is:

(1)   in the public domain at the time it was disclosed or enters the public domain without the fault of the receiving party;

(2)   known without restriction to the receiving party at the time of disclosure by the disclosing party;

(3)   used or disclosed with the prior written approval of the disclosing party;

(4)   independently developed by the disclosing party; or

(5)   required to be disclosed by law to a government agency or court, so long as the receiving party promptly provides the disclosing party with written notice of the required disclosure in order to allow the disclosing party to object to production of the information.

(b)   No license under any patents, trademarks, copyrights, technology, or other trade secrets is granted or conveyed by the act of the disclosing party transmitting Proprietary Information to the receiving party hereunder nor shall such a transmission constitute any representation, warranty, assurance, guaranty or inducement by the disclosing party to the receiving party with respect to the infringement of patent or other right of others.

(c)   All Proprietary Information furnished hereunder shall remain the property of the disclosing party and shall be returned to it or destroyed promptly at its request together with all copies made thereof by the receiving party.  Upon request, the receiving party shall send the disclosing party written notice certifying destruction.

(d)   The obligations concerning the Proprietary Information exchanged hereunder shall continue for the last to occur of either (i) a period of five (5) years from the date of execution of this Agreement, or (ii) two (2) years after each such item Proprietary Information is furnished.

8.   **ASSIGNMENT, CHANGES IN OWNERSHIP AND MANAGEMENT**

(a)   This Agreement and any right or obligation hereunder may not be assigned or delegated by REPRESENTATIVE without the prior written approval of the COMPANY.

(b)   REPRESENTATIVE shall promptly advise the COMPANY of any change in the financial or ownership interests in or management of REPRESENTATIVE.  If, in the opinion of the COMPANY, such changes substantially affect the financial or ownership interests in or management of REPRESENTATIVE, the COMPANY may immediately terminate this Agreement by written notice.

(c)   The COMPANY may assign this Agreement to any corporation or division controlling, controlled by or under common control with the COMPANY and to any successor to that portion of the business of the COMPANY to which this Agreement relates.

9. TERM AND TERMINATION

(a)  This Agreement shall become effective on 1 March 2012 and shall terminate on 28 February 2015, unless previously terminated under one or more of the conditions set forth in this Section 9.

(b)  Any party may unilaterally terminate this Agreement at any time without cause and without any obligation to pay compensation to the other party by reason of such termination by written notice of termination effective as follows:

(1)  if issued by REPRESENTATIVE, upon receipt of such notice by the COMPANY; or

(2)  if issued by the COMPANY, thirty (30) days from the date of such notice.

(c)  REPRESENTATIVE accepts and acknowledges that the COMPANY may terminate this Agreement immediately by written notice for cause, which shall include, among other circumstances:  (1) material breach of any of the terms and conditions hereof; (2) fraud or misrepresentation with respect to entering into and/or performance under this Agreement; (3) a change in the information contained in Section 6(d) of this Agreement; (4) the COMPANY learns of circumstances that give it reason to believe that REPRESENTATIVE has engaged in illegal conduct or unethical business practices in connection with the performance of this Agreement; (5) REPRESENTATIVE or any of its owners or employees responsible for its services under this Agreement has become the target of an investigation or prosecution by any government authority for alleged corruption; or (6) REPRESENTATIVE fails to satisfactorily pass (or provides false or misleading information to support) any background due diligence investigation conducted by the COMPANY at any time during the term of this Agreement as determined in the COMPANY's sole discretion.  REPRESENTATIVE shall not be entitled to receive, and REPRESENTATIVE hereby waives rights to, any compensation following termination for cause, even if resulting from REPRESENTATIVE's efforts prior to such termination.

(d)  This Agreement shall automatically terminate without notice by any party in the event of the institution of voluntary or involuntary bankruptcy proceedings by or against any party.  For this purpose, "bankruptcy proceedings" shall mean any proceedings under the United States Bankruptcy Act or equivalent foreign law.  If REPRESENTATIVE is an individual proprietorship, death or judicial adjudication of incompetency, or if a partnership, dissolution of the partnership by death or otherwise, or if a corporation, dissolution of the corporation, shall also automatically terminate this Agreement without notice by either party.

(e)  This Agreement shall automatically terminate one day before the effective date of any new distributor (representative) protective laws in the jurisdiction of REPRESENTATIVE or in the Territory, which laws the COMPANY determines to be in conflict with the agreement of the parties as detailed herein.  REPRESENTATIVE hereby waives any and all benefits of any distributor (representative) protective legislation that might otherwise be available as a result of the termination of this Agreement.

(f)  REPRESENTATIVE shall not be entitled to receive any termination payment or compensation of any kind because of expiration, termination or non-renewal of this Agreement, and REPRESENTATIVE agrees that any enhancements in the value of REPRESENTATIVE's goodwill as a result of its representation of the COMPANY shall inure to the benefit of the COMPANY.

(g)  Neither party shall be liable to the other for losses or damages of any kind or character because of expiration, termination or non-renewal of this Agreement, whether such losses or damages arise from the manufacture of Listed Products, or from the loss of prospective profits or loss of compensation for sales or expenses incurred or loss of investments made in connection with the establishment, development or maintenance of REPRESENTATIVE's business, or from any other cause.

10.   SUCCESSION

Subject to Section 8 hereof, this Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties hereto.

11.   NOTICE

All notices required under this Agreement shall be in writing and sent by facsimile or e-mail with confirmation to the respective parties by overnight courier or certified or registered mail, addressed as follows unless otherwise specified on the individual Schedule attached hereto with respect to the COMPANY:

To:  Selectron Korea Inc.                          To:    The COMPANY
4th Fl. Castle Praha Bldg.                         c/o Textron Systems Corporation
395-19 Seokyo-dong Mapo-gu                          201 Lowell Street
Seoul, Korea                                        Wilmington, MA 01887
                                                    Attn: Alex Min

Notices & Authorizations to:                        Notices & Authorizations to:
Attn: Tai Ham                                        Attn: Carl G. Buzawa, Sr. Vice President
Co-CEO                                              Legal, Contracts and Compliance

Either party may change its address and contact information by giving written notice to the other.

12.   CHOICE OF LAW; JURISDICTION

(a)   The parties agree that no action or proceeding may be maintained by REPRESENTATIVE against COMPANY except either in a state or federal court located in Boston, Massachusetts, USA, and REPRESENTATIVE hereby irrevocably waives any right it may have to commence any action or proceeding against COMPANY in any other court, including those in the Territory. REPRESENTATIVE further hereby submits to the personal jurisdiction of the aforementioned courts with respect to any claims brought by COMPANY in connection with this Agreement, and irrevocably waives any rights or defenses it may have under the laws of any country, state or other jurisdiction to commencement or continuation of any action against it in the aforementioned courts based on lack of personal jurisdiction or improper or inconvenient venue.   All judgments and orders issued by the aforementioned courts against REPRESENTATIVE in favor of COMPANY may be enforced by any court in any jurisdiction in which REPRESENTATIVE or any of its assets are located. REPRESENTATIVE hereby further agrees that service of process may be made upon it by certified or registered mail or personal service at the address provided for above.   This Agreement shall be governed by the laws of the Commonwealth of Massachusetts, U.S.A., without regard to the conflict of laws principles of any jurisdiction.  The rights and obligations of the parties hereunder shall not be governed by the provisions of the 1980 U.N. Convention on Contracts for the International Sale of Goods.

(b)   Upon the occurrence of certain events, which the COMPANY believes, in its sole discretion, may cause it irreparable harm, the amount of which may be difficult to ascertain and for which monetary damages may be inadequate, the COMPANY and REPRESENTATIVE hereby agree that COMPANY shall be entitled to obtain an injunction or restraining order, without bond, upon ex parte or other petition to a court of competent jurisdiction, restraining or enjoining any such further violation, and for such other relief as the COMPANY shall deem appropriate. This right to injunction or restraining order shall not be construed to prohibit the COMPANY from pursuit of any and all other remedies available to it at law or in equity, including recovery of damages.

13.   RELATIONSHIP OF THE PARTIES

Rev 10/18/11

The relationship created by this Agreement is that of independent representative and neither REPRESENTATIVE nor any of its officers, agents, salesmen or employees shall have any right or authority to:

(a)  Conduct any business in the name of or for the account of the COMPANY;

(b)  Make any proposals, promises, warranties, guarantees or representations on behalf of or in the name of the COMPANY;

(c)  Assume or create any obligation of any kind, express or implied, on behalf of the COMPANY;

(d)  Enter into contracts or commitments in the name of the COMPANY;

(e)  Bind the COMPANY in any respect whatsoever;

(f)  Engage in conduct that would suggest to any customer or potential customer of the COMPANY that REPRESENTATIVE has the authority to take any act on behalf or in the name of the COMPANY, including those enumerated in this Section

14.  **COMPETING PRODUCTS**

During the term of this Agreement, unless REPRESENTATIVE has obtained the prior written consent of the COMPANY, REPRESENTATIVE agrees that it will not, directly or indirectly, produce, promote or sell any products or engage in any business activity that is competitive with the COMPANY or the Listed Products.  Permission to sell or act as a sales representative or distributor for a competitor of the COMPANY may be granted or withdrawn on thirty (30) days' prior written notice to REPRESENTATIVE.

15.  **AMENDMENT**

Any provision of this Agreement, including the Schedules hereto, may be revised by mutual agreement by the parties expressed by the signatures of their duly authorized representatives upon such revisions, without affecting any other provision of this Agreement. No letter, telex, facsimile or other communication between the parties hereto shall become a part of or in any way modify or change this Agreement unless it is expressly stated in such communication that it is to become a part of this Agreement by attachment thereto and bears the signatures of duly authorized representatives of both parties, which may be accomplished by separate execution of duplicate counterparts of such communication and exchange of same.

16.  **SEVERABILITY**

If any portion of this Agreement shall be considered or held by any authority or court having jurisdiction over one of the parties or over the subject matter of this Agreement to be prohibited and/or void, such action shall not affect the validity of the remaining provisions of this Agreement which shall be considered separable from the prohibited or void provision, and this Agreement shall thereupon be deemed to be written, or to be rewritten, as the case may be, without such prohibited or void provision.

17.  **INDEMNIFICATION**

Rev 10/18/11

REPRESENTATIVE hereby agrees to indemnify and hold harmless the COMPANY, its employees, customers, successors, assigns and others us to any claim asserted against the COMPANY or its employees, customers, successors, assigns or others alleging any liability arising out of any breach of this Agreement or negligent or intentional wrongful act of REPRESENTATIVE that occurs during the term of this Agreement. Such liability shall include, but is not limited to, damages (including punitive damages), costs, fees and expenses.

18.   **SURVIVAL.**

The obligations of Sections 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18 hereof shall survive the expiration or termination of this Agreement.

19.   **ENTIRE AGREEMENT**

This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements or understandings, written or oral. Each party hereby waives the right to assert any claim against the other, its employees, customers or assigns, based on any oral representations, statement, promise or agreement whether made before or after the date of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the respective dates set forth below.

SELECTRON KOREA INC.

By: _____

Title: _Vice President_____

Witness: _____

Date: _Feb. 17, 2012_____

*Note: Signatures on behalf of the COMPANY appear on Schedules A, B, C and D, as described in the Preamble to this Agreement.*

## SCHEDULE A
### LISTED PRODUCTS AND COMMISSIONS FOR TEXTRON SYSTEMS CORPORATION

#### Listed Products

1. Sensor Fuzed Weapon (SFW) defined as CBU-97 and/or CBU-105.*

*Note: SFW is now listed by the U.S. Government for sale only via the Foreign Military Sales (FMS) process.*

2. SFW integration assets and related logistics support.

3. BLU-108 Submunition.**

**Note: Commission value is calculated against the net sale price of the submunitions not inclusive of the carrier, i.e., AGM-154B or associated costs.*

4. EO/IR Sensor Systems

5. MicroObserver® Unattended Ground Sensor

#### Commission Rates

All commission payments are subject to all of the provisions of the Agreement relating to the amount and timing of payment of commissions, including, without limitation, Sections 4 and 5 of the Agreement.

#### DIRECT COMMERCIAL SALES COMMISSION SCHEDULE

5% of Net Sales Price for products listed above.

Commissions will be paid incrementally subject to award and receipt of funds.

If commissions are permitted under local law but not allowable as a direct charge to the contract the payable commission rate under the contract will be 2%.

#### *Illustration of Commission Calculation for Direct Commercial Sales*

For Direct Commercial Sales, Textron Systems Corporation includes an allowance for commission in developing its contract price. In order to assure that commissions are not paid on commissions, TSC calculates commissions by dividing the contract price received by TSC, reduced by any amounts described in Section 4(e), subparagraphs (i) and (iv), by 1.05 (if the commission rate is 5%) to determine the Net Sales Price and multiplying the Net Sales Price by the 5% commission rate to determine the contract price. TSC's invoices to REPRESENTATIVE will disclose that an allowance for commissions has been included in the contract price.

For example, if the contract price received by TSC, reduced any amounts described in Section 4(e), subparagraphs (i) and (iv), is $100 and the commission rate is 5%, TSC divides the $100 by 1.05, which equals $95.24, the amount of the Net Sales Price that will be received by TSC, and multiplies that amount ($95.24) by 5% to calculate REPRESENTATIVE's commission of $4.76. When these two amounts, $95.24 and $4.76 are added together, the result is exactly $100 (the contract price reduced by any amounts described in Section 4(e)).

Rev 10/18/11

### FOREIGN MILITARY SALES (FMS) AND DIRECT SALES FUNDED UNDER US FOREIGN MILITARY FINANCED (FMF) COMMISSION SCHEDULE

2% of Net Sales Price.

Commissions will be paid incrementally subject to award and receipt of funds.

For purposes of calculating the contract price of Products, each contract or order for Products and all amendments shall be considered as one contract.

#### Illustration of Commission Calculation for FMS, FMF and Certain Commercial Sales

In the case of (i) FMF transactions, (ii) FMS transactions, and (iii) transactions in which commissions are permitted under local law but are not allowable as a direct charge to the contract; a commission in the amount of 2% of the Net Sales Price will be paid. No allowance for commissions will be included in the contract price.

TEXTRON SYSTEMS CORPORATION

By: _____
      Jan Walsh

Title: __Sr. Vice President, Operations__

Witness: _____

Date: __2/27/12__

*Note: Signature on behalf of the REPRESENTATIVE appears on page 14 of this Agreement.*

## SCHEDULE B
### LISTED PRODUCTS AND COMMISSIONS FOR AAI CORPORATION

#### Listed Products

1.  Advanced Boresight Equipment ("ABE")

2.  On-Board Training System ("OBTS")

#### Commission Rates

All commission payments are subject to all of the provisions of the Agreement relating to the amount and timing of payment of commissions, including, without limitation, Sections 4 and 5 of the Agreement.

### DIRECT COMMERCIAL SALES COMMISSION SCHEDULE

5% of Net Sales Price for products listed above.

Commissions will be paid incrementally subject to award and receipt of funds.

If commissions are permitted under local law but not allowable as a direct charge to the contract the payable commission rate under the contract will be 2%.

#### *Illustration of Commission Calculation for Direct Commercial Sales*

For Direct Commercial Sales, AAI includes an allowance for commission in developing its sales price. In order to assure that commissions are not paid on commissions, AAI calculates commissions by dividing the contract price received by AAI, reduced by any amounts described in Section 4(e), subparagraphs (i) and (iv), by 1.05 (if the commission rate is 5%) to determine the Net Sales Price and multiplying the Net Sales Price by the 5% commission rate to determine the contract price. AAI's invoices to REPRESENTATIVE will disclose that an allowance for commissions has been included in the contract price.

For example, if the contract price received by AAI, reduced by any amounts described in Section 4(e), subparagraphs (i) and (iv), is $100 and the commission rate is 5%, AAI divides the $100 by 1.05, which equals $95.24, the amount of the Net Sales Price that will be received by TM&LS, and multiplies that amount ($95.24) by 5% to calculate REPRESENTATIVE's commission of $4.76. When these two amounts, $95.24 and $4.76 are added together, the result is exactly $100 (the contract price reduced by any amounts described in Section 4(e)).

### FOREIGN MILITARY SALES (FMS) AND DIRECT SALES FUNDED UNDER US FOREIGN MILITARY FINANCED (FMF) COMMISSION SCHEDULE

2% of Net Sales Price.

Commissions will be paid incrementally subject to award and receipt of funds.

Rev 10/18/11

For purposes of calculating the contract price of Products, each contract or order for Products and all amendments shall be considered as one contract.

### Illustration of Commission Calculation for FMS, FMF and Certain Commercial Sales

In the case of (i) FMF transactions, (ii) FMS transactions, and (iii) transactions in which commissions are permitted under local law but are not allowable as a direct charge to the contract; a commission in the amount of 2% of the Net Sales Price will be paid. No allowance for commissions will be included in the contract price.

**AAI CORPORATION**

By: _Ian Walsh_

Title: **Sr. Vice President**, Operations

Witness: _Illegible_

Date: _2/27/12_

*Note:  Signature on behalf of the REPRESENTATIVE appears on page 14 of this Agreement.*

## SCHEDULE D

### LISTED PRODUCTS AND COMMISSIONS FOR OVERWATCH SYSTEMS LIMITED

#### Listed Products

1. AXIS-Pro
2. Medina Wireless (MWS)
3. Scout
4. T-Rex
5. Global ImageViewer Series Product Group (See Exhibit 3 for Listed Products in this group)
6. Advanced Software Product Group (See Exhibit 3 for Listed Products in this group)
7. RemoteView Series Product Group (See Exhibit 3 for Listed Products in this group)

#### Commission Rates

All commission payments are subject to all of the provisions of the Agreement relating to the amount and timing of payment of commissions, including, without limitation, Sections 4 and 5 of the Agreement.

#### DIRECT COMMERCIAL SALES COMMISSION SCHEDULE

10% of the first $3,000,000 of the Net Sales Price, 12.5% of the next $3,000,000 of Net Sales Price, 15% of the amount of Net Sales Price in excess of $6,000,000.

Commissions will be paid incrementally subject to award and receipt of funds.

If commissions are permitted under local law but not allowable as a direct charge to the contract the payable commission rate under the contract will be 2%.

#### *Illustration of Commission Calculation for Direct Commercial Sales*

For Direct Commercial Sales, TM&LS includes an allowance for commission in developing its sales price. In order to assure that commissions are not paid on commissions, TM&LS calculates commissions by dividing the contract price received by TM&LS, reduced by any amounts described in Section 4(e), subparagraphs (i) and (iv), by 1.05 (if the commission rate is 5%) to determine the Net Sales Price and multiplying the Net Sales Price by the 5% commission rate to determine the contract price. TM&LS's invoices to REPRESENTATIVE will disclose that an allowance for commissions has been included in the contract price.

For example, if the contract price received by TM&LS, reduced by any amounts described in Section 4(e), subparagraphs (i) and (iv), is $100 and the commission rate is 5%, TM&LS divides the $100 by 1.05, which equals $95.24, the amount of the Net Sales Price that will be received by TM&LS, and multiplies that amount ($95.24) by 5% to calculate REPRESENTATIVE's commission of $4.76. When these two amounts, $95.24 and $4.76 are added together, the result is exactly $100 (the contract price reduced by any amounts described in Section 4(e)).

#### FOREIGN MILITARY SALES (FMS) AND DIRECT SALES FUNDED UNDER US FOREIGN MILITARY FINANCED (FMF) COMMISSION SCHEDULE

4% of the first $1,000,000 of the Net Sales Price, 5% of the next $2,000,000 of Net Sales Price, 6% of the amount of Net Sales Price in excess of $3,000,000.

Rev 10/18/11

Commissions will be paid incrementally subject to award and receipt of funds.

For purposes of calculating the contract price of Products, each contract or order for Products and all amendments shall be considered as one contract

### *Illustration of Commission Calculation for FMS, FMF and Certain Commercial Sales*

In the case of (i) FMF transactions, (ii) FMS transactions, and (iii) transactions in which commissions are permitted under local law but are not allowable as a direct charge to the contract; a commission in the amount of 2% of the Net Sales Price will be paid. No allowance for commissions will be included in the contract price.

**OVERWATCH SYSTEMS LIMITED**

By: _____
     Jim Walsh

Title:   Sr. Vice President, Operations Support

Witness:   _____

Date:   2/27/12

*Note: Signature on behalf of the REPRESENTATIVE appears on page 14 of this Agreement.*

EXHIBIT 1

FORM OF INVOICE

[Representative's Name and Address on letterhead]                    Date:

To:    [TS Operating Unit Name, Address and POC]

| Date | Contract/PO Reference | | Customer Payment Under Contract/PO | Commission Rate | Total |
|------|----------------------|---|-----------------------------------|-----------------|-------|

Total Compensation:                                                           $

Attachments:    (1)  Latest activity report
                (2)  Certification (Exhibit 2)

Wiring Instructions:

Bank Name and Address:
Account Name:
Account Number:
SWIFT Code:
U.S. Intermediary Bank
Name and Address:
ABA Number:

Rev 10/15/11

## EXHIBIT 2

## CERTIFICATION

In connection with the transactions contemplated under the Independent Representative Agreement (the "Agreement") with Textron Systems Corporation or one of its operating units (the "Company") or in connection with the any other business transaction, Representative hereby:

1.    Represents and certifies that Representative has not and will not offer, pay, promise to pay, or authorize the payment, directly or indirectly, of any money or anything of value to:

        (i)    any Government Official (as defined in the Agreement);
        (ii)   any political party, official of a political party, candidate for political office ;
        (iii)  any intermediary for payment to any of the foregoing;
        (iv)  any officer, director or employee of the Company or any of its affiliates;
        (v)   any Close Family Member (as defined in the Agreement) of any of the foregoing; or
        (vi)  any other person or entity if such payment or transfer would violate the laws of the country in which made or the laws of the United States.

2.    Represents and certifies that no direct or indirect owner, officer, director or employee of Representative is a Government Official, an official of a political party or a candidate for political office in the Territory, or a Close Family Member of n Governmental Official, official of a political party or a candidate for political office.

3.    Certifies that this is a full and complete disclosure as to the matters set forth above and agrees that this Certification will be supplemented in the event facts become known which would materially change this Certification.

*Selectron Korea Inc.*

Representative

By *Ahn Kwang Soo*

Printed Name: *Ahn, Kwang. Soo*

Title: *Vice President*

Date: *Feb 19, 2012*

| | |
|---|---|
| ELT-NET-LIC-FLOAT | ELT/NET NITF Imagery Internet Plug-in (floating license) |
| SPPG-NL | SpotLite PRO Perspective 3D View Extension (node-locked license) |
| SPPG-FL | SpotLite PRO Perspective 3D View Extension (floating license) |
| GEOCAT-SERVER-LIC-INIT | GeoCatalog Server-Includes Initial 1-8 Core Processors  Perspective 3D View Extension (node-locked license) |
| GEOCAT-SERVER-LIC-ADD | GeoCatalog Server-Additional 9-15 Core Processors Imagery & Geospatial Data Mangement Server |
| GEOCAT-SERVER-LIC-ADD | GeoCatalog Server-Additional 16-50 Core Processors Imagery & Geospatial Data Mangement Server |
| GEOCAT-SERVER-LIC-ADD | GeoCatalog Server-Additional 50+ Core Processors Imagery & Geospatial Data Mangement Server |
| GEOCAT-CLIENT-LIC | GeoCatalog Client Imagery & Geospatial Data Mangement Client-node-locked license |

| Part Number | Documentation and Media |
|---|---|
| GIV-MEDIA | Global ImageViewer Media (CD-ROM) |
| GIV-DOC | Global ImageViewer Media User Documentation |
| ELT-NET-MEDIA | *ELT/NET Media - CD Distribution |
| ELT-SPOTLITE-MEDIA | *ELT/SPOTLITEPRO Media - CD Distribution |
| GEOCAT-MEDIA | GeoCatalog Media - CD Distribution |

| Advanced Products Series Software | |
|---|---|
| **Part Number** | **Application** |
| FA-P-N-A | Feature Analyst-PRO-Node-locked-ArcGis |
| FA-P-N-I | Feature Analyst-PRO-Node-locked-Imagine |
| FA-P-FL-A | Feature Analyst-PRO-Floating-ArcGis |
| FA-P-FL-I | Feature Analyst-PRO-Floating-Imagine |
| FA-S-N-A | Feature Analyst-STD-Node-locked-ArcGis |
| FA-S-N-I | Feature Analyst-STD-Node-locked-Imagine |
| FA-S-FL-A | Feature Analyst-STD-Floating-ArcGis |
| FA-S-FL-I | Feature Analyst-STD-Floating-Imagine |
| LA-N-A | LIDAR Analyst-Node-locked-ArcGis |
| LA-N-I | LIDAR Analyst-Node-Locked-Imagine |
| LA-FL-A | LIDAR Analyst-Floating-ArcGis |
| LA-FL-I | LIDAR Analyst-Floating-Imagine |
| RT-N-A | Road Tracker-Extension-Feature Analyst-Node-locked-ArcGIS |
| RT-N-I | Road Tracker-Extension-Feature Analyst-Node-locked-Imagine |
| RT-FL-A | Road Tracker-Extension-Feature Analyst-Floating-ArcGIS |
| RT-FL-I | Road Tracker-Extension-Feature Analyst-Floating-Imagine |

| Part Number | Application |
|---|---|
| FA-A-EDU-1 | Feature Analyst for ArcGis Academia Subscription |
| FA-A-EDU-5 | Feature Analyst for ArcGis Academia Subscription |
| FA-A-EDU-15 | Feature Analyst for ArcGis Academia Subscription |
| FA-A-EDU-30 | Feature Analyst for ArcGis Academia Subscription |
| FA-A-EDU-60 | Feature Analyst for ArcGis Academia Subscription |
| FA-I-EDU-1 | Feature Analyst for Imagine Academia Subscription |
| FA-I-EDU-5 | Feature Analyst for Imagine Academia Subscription |
| FA-I-EDU-15 | Feature Analyst for Imagine Academia Subscription |

| Remoteview Series Software Maintenance | |
|---|---|
| Part Number | Maintenance |
| RV-Pro-N-W-M | RemoteView-Pro-Windows-Maintenance & Support |
| RV-Pro-N-U-M | RemoteView-Pro-UNIX-Maintenance & Support |
| RV-Pro-FL-W-M | RemoteView-Pro-WIN-Floating-Maintenance & Support |
| RV-Pro-FL-U-M | RemoteView-Pro-Floating-UNIX-Maintenance & Support |
| RV-Pro-W-USB-M | RemoteView-Pro-USB Dongle-Maintenance & Support |
| RV-Pro-VM-N-W-M | RemoteView-Pro-Virtual Mosaic Extension-Maintenance & Support |
| RV-Pro-VM-FL-W-M | RemoteView-Pro-Virtual Mosaic Extension Floating-Maintenance & Support |
| RV-Pro-3DPro-N-W-M | RemoteView-Pro-3D Pro Extension-Maintenance & Support |
| RV-Pro-3DPro-FL-W-M | RemoteView-Pro-3D Pro Extension Floating-Maintenance & Support |
| RV-D-N-W-M | RemoteView-Desktop-Windows-Maintenance & Support |
| RV-D-N-U-M | RemoteView-Desktop-UNIX-Maintenance & Support |
| RV-D-FL-W-M | RemoteView-Desktop-Floating-Maintenance & Support |
| RV-Pro-VM-N-U | RemoteView-Pro-Virtual Mosaic-Maintenance & Support |
| RV-Pro-VM-FL-U | RemoteView-Pro-Virtual Mosaic-Floating-Maintenance & Support |
| RVC-N-M | RVConnect single user node locked license-Maintenance & Support |
| RVC-FL-M | RVConnect single user floating license-Maintenance & Support |
| GEOCAT-SERVER-M | GeoCatalog Server-Includes initial 1-8 Core Processors-Maintenance & Support |
| GEOCAT-CP-9-15-M | GeoCatalog Server-Additional 9-15 Core Processors-Maintenance & Support |
| GEOCAT-CP-16-50-M | GeoCatalog Server-Additional 16-50 Core Processors-Maintenance & Support |
| GEOCAT-CP-50+-M | GeoCatalog Server-Additional 50+ Core Processors-Maintenance & Support |
| GEOCAT-CLIENT-M | GeoCatalog Client-Maintenance & Support |
| Global ImageViewer Series Software Maintenance | |
| Part Number | Maintenance |
| GIV-MAIN | Global ImageViewer Maintenance & Support for a single user node-locked license |
| GIV-MAIN-FL | Global ImageViewer Maintenance & Support for a single user floating license |
| GIV-C-N-M | Global ImageViewer Connect Maintenance & Support for a single node-locked license |
| GIV-C-FL-M | Global ImageViewer Connect Maintenance & Support for a single floating license |
| ELT-NET-MAIN | ELT/NET NITF Imagery Internet Plug-in; Maintenance & Support for a single node-locked license |
| ELT-NET-MAIN-FLOAT | ELT/NET NITF Imagery Internet Plug-in; Maintenance & Support for a single floating license |
| GIV-SPOTLITEPRO-MAIN | SpotLitePRO Perspective 3D View Extension Maintenance & Support for a single node-locked license |
| GIV-SPOTLITEPRO-MAIN-FL | SpotLitePRO Perspective 3D View Extension; Maintenance & Support for a single floating license |
| GEOCAT-SERVER-LIC-INIT | GeoCatalog Server; Maintenance & Support for a 1-8 Core Processor license |
| GEOCAT-SERVER-LIC-ADD | GeoCatalog Server; Maintenance & Support for an Additional 9-15 Core Processor license |
| GEOCAT-SERVER-LIC-ADD | GeoCatalog Server; Maintenance & Support for an Additional 16-50 Core Processor license |
| GEOCAT-SERVER-LIC-ADD | GeoCatalog Server;  Maintenance & Support for Additional 50+ Core Processor license |
| GEOCAT-CLIENT-LIC | GeoCatalog Client Imagery & Geospatial Data Mangement Client; Maintenance & |